UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
PIKEVILLE DIVISION

Eastern District of Kentucky
**FILED**

JAN 3 0 2023

At Pikeville
Robert R. Carr
CLERK U.S. DISTRICT COURT

CRIMINAL ACTION NO. 7:22-CR-012-REW

UNITED STATES OF AMERICA                  PLAINTIFF

V.                 **PLEA AGREEMENT**

WALTER PERKINS                             DEFENDANT

\* \* \* \* \*

1. Pursuant to Federal Rule of Criminal Procedure 11(c), the Defendant will enter a guilty plea to Count 3 of the Indictment, charging a violation of 30 U.S.C. § 820(c) and Count 4 of the Indictment, charging a violation of 18 U.S.C. § 1001. Pursuant to Rule 11(c)(1)(A), the United States will move to dismiss Count 5 at the time of sentencing.

2. The essential elements of Count 3 are:

    (a) Black Diamond Coal, LLC was an operator of a coal mine;

    (b) Walter Perkins, was a certified dust sampler and an agent of Black Diamond Coal, LLC,

    (c) Walter Perkins knowingly authorized, ordered, or carried out the violation of the mandatory health and safety standard under 30 C.F.R. Part 70.

The essential elements of Count 4 are:

    (a) Walter Perkins knowingly and willfully,

    (b) Made a materially false, fictitious, or fraudulent statement and

   (c) The statement pertained to a matter within the jurisdiction of the executive branch of the Government of the United States, to wit, the United States Department of Labor.

3. As to Counts 3 and 4 of the Indictment, the United States could prove the following facts that establish the essential elements of the offenses beyond a reasonable doubt, and the Defendant admits these facts:

From August 1, 2018, to April 8, 2021, Black Diamond Coal, LLC, (Black Diamond) was the Kentucky corporate operator of the Mine #1 underground coal mine located in Floyd County, Kentucky in the Eastern District of Kentucky, and was subject to the provisions of the Federal Mine Safety and Health Act of 1977, in that Black Diamond utilized equipment manufactured outside of the Commonwealth of Kentucky that entered into or affected interstate commerce. Black Diamond was required to follow mandatory health and safety standards promulgated by the Federal Mine Safety and Health Administration (MSHA), an agency within the United States Department of Labor, part of the executive branch of the Government of the United States.

Black Diamond was required to monitor the respirable coal dust in Mine #1 every quarter on consecutive normal production shifts until 15 valid representative samples were taken. This monitoring is known as "sampling." The sampling provides information to the operators and MSHA on the levels of respirable coal mine dust in the air that miners breathe.

On or about July 25, 2019, Walter Perkins was employed by Black Diamond at Mine #1 and received training by the MSHA in the dust-sampling process. Perkins was given

and passed a test on how to conduct dust-sampling. After attending the training and passing the test, Perkins was certified by MSHA to conduct respirable coal dust sampling as required under 30 C.F.R. Part 70. Thereafter, Black Diamond assigned Perkins the responsibility of respirable coal dust sampling at Mine #1. As the person in charge of dust sampling, Perkins was an agent of Black Diamond as defined by 30 U.S.C. § 802(c).

Respirable coal dust sampling is required by MSHA to ensure that the levels of respirable coal dust in the mine are low enough that miners are not exposed to the risk of developing coal workers' pneumoconiosis or "black lung." Black lung is caused by coal dust particles entering into the lungs and eventually forming massive impenetrable fibrous tissue that significantly restricts the lung's functions and causes scarring, which can lead to lung failure and death. Once black lung develops, it cannot be reversed. There are no specific treatments to cure black lung. And the chronic effects of black lung may progress even after the miners are no longer exposed to respirable coal dust.

MSHA's mandatory health and safety standards require mining companies, or "operators," like Black Diamond to monitor the respirable coal dust in their mines every quarter on consecutive normal production shifts until 15 valid samples are taken. 30 C.F.R. § 70.208. This monitoring is also referred to as sampling.

Sampling must be conducted by a certified person. 30 C.F.R. § 70.202(a). A certified person has taken a class taught by MSHA and passed a certification test. 30 C.F.R. § 70.202(b). In this case, Black Diamond selected Perkins as its certified person to conduct

3

the sampling. Sampling is done using a device the size of cassette tape recorder called a continuous personal dust monitor (or CPDM). Here is an example:





CPDMs are sometimes referred to as "dust pumps." CPDMs must be worn by miners performing specific jobs at specific locations. 30 C.F.R. § 70.208 (designated occupations) & 30 C.F.R. § 70.209 (designated locations). In this case, on October 6, 7, and 8, 2020, the pump should have been worn by the continuous miner machine operator or "miner man."

During the sampling period, each CPDM must be worn and operated by the miners being sampled for the entire time they are underground during their entire shift. 30 C.F.R. § 70.210(c). The certified person who is performing the sampling must make certain checks to ensure the CPDM is being worn and running. 30 C.F.R. § 205(c). Each CPDM must remain with the miner who is being sampled. 30 C.F.R. § 70.208(b). The certified person must validate, certify, and transmit electronically to MSHA within 24 hours after the end

of the shift all sample data file information collected and stored in the CPDM, including the sampling status conditions when sampling. 30 C.F.R. § 70.210(f).

On October 8, 2020, Black Diamond was conducting its quarterly sampling. The sampling had started several days before, at least by October 6, 2020. Black Diamond submitted electronic sampling data from October 6 and 7, 2020 to MSHA. On the morning of October 8, 2020, MSHA inspectors arrived at the Mine #1 for an inspection under 30 U.S.C. § 803(a) and discovered a CPDM running on the surface in the first aid trailer.





Perkins, Black Diamond's agent and certified person, claimed he had given the CPDM to the continuous miner machine operator, for the shift's sampling, but that the operator returned it to Perkins because the CPDM went off and had a fault.

Perkins now admits that he never gave the CPDM to the continuous miner machine operator and the device never faulted. Perkins knew the statement that he made to the MSHA health specialist, a United States Department of Labor employee, that he had given the CPDM to the continuous miner machine operator was false. He further knew that the statement that the continuous miner machine operator had returned it to Perkins because the CPDM had faulted was also false. A MSHA health specialist ran a diagnostic on the

CPDM at the mine site that day and the device indicated no faults. Further, the CPDM indicated that the ambient temperature was in the 70s or 80s degrees Fahrenheit. Had the CPDM been underground, it would have reflected a significantly lower temperature. The CPDM also records its tilt or movement and the device showed it had not been moved that day.

On or about October 6 and 7, 2020, Black Diamond, through Perkins and another certified dust sampler for Mine #1, submitted dust-sampling data to MSHA purporting to be valid dust sampling results. The sampling data submitted, however, did not show that any levels of dust had been recorded by the CPDM on those days. When MSHA inspectors interviewed the continuous mining machine operator, he explained that Perkins had not given him a CPDM to wear on October 6, 7, or 8, 2020. The miner was not aware that the dust sampling period had begun. Nonetheless, on October 6, 2020, Perkins gave the CPDM to another certified dust sampler to upload its data to MSHA despite knowing the dust sampling had not been conducted as required by 30 C.F.R. Part 70. Again, on October 7, 2020, Perkins gave the CPDM to the other certified dust sampler to upload its data to MSHA despite knowing the dust sampling had not been conducted as required by 30 C.F.R. Part 70. The regulation at 30 C.F.R. § 70.210 requires mine operators to also maintain and post the results of respirable coal dust sampling at their mine sites, but when inspectors were there on October 8, 2020, none of the dust sampling results for October 2020 or before were posted.

4. The statutory punishment for Count 3 is not more than one year of imprisonment, a fine of not more than $250,000.00, and a term of supervised release of not more than one year. The statutory punishment for Count 4 is not more than five years of imprisonment, a fine of not more than $250,000.00, and a term of supervised release of not more than three years. A mandatory special assessment of $125.00 applies, and the Defendant will pay this assessment to the U.S. District Court Clerk at the time of the entry of the sentence.

5. Pursuant to Rule 11(c)(1)(B), the United States and the Defendant recommend the following sentencing guidelines calculations, and they may object to or argue in favor of other calculations. The relevant conduct includes the information contained in the discovery and paragraph 3 of this Agreement. This recommendation does not bind the Court.

> (a) United States Sentencing Guidelines (U.S.S.G.), November 1, 2021 manual, will determine the Defendant's guidelines range.
>
> (b) Pursuant to U.S.S.G. § 2X5.2, the base offense level for Count 3 is 6.
>
> (c) Pursuant to U.S.S.G. § 2B1.1, the base offense level for Count 4 is 6.
>
> (d) Pursuant to U.S.S.G. § 2B1.1(b)(16), increase the offense level to 14 for Count 4 because the offense, including the relevant conduct, involved a conscious or reckless risk of serious bodily injury.
>
> (e) Pursuant to U.S.S.G. § 3B1.3, increase the offense level by 2 for abuse of a position of trust.
>
> (f) Pursuant to U.S.S.G. §3D1.2, the offenses group.

(g) Pursuant to U.S.S.G. § 3E1.1 and unless the Defendant commits another crime, obstructs justice, or violates a court order, decrease the offense level by 2 levels for the Defendant's acceptance of responsibility. If the offense level determined prior to this 2-level decrease is level 16 or greater, the United States will move at sentencing to decrease the offense level by 1 additional level based on the Defendant's timely notice of intent to plead guilty.

6. No agreement exists about the Defendant's criminal history category pursuant to U.S.S.G. Chapter 4.

7. The Defendant will not file a motion for a decrease in the offense level based on a mitigating role pursuant to U.S.S.G. § 3B1.2 or a departure motion pursuant to U.S.S.G. Chapter 5, Parts H or K.

8. The Defendant waives the right to appeal the guilty plea, conviction, and sentence. Except for claims of ineffective assistance of counsel, the Defendant also waives the right to attack collaterally the guilty plea, conviction, and sentence.

9. The Defendant agrees to cooperate fully with the United States Attorney's Office by making a full and complete financial disclosure. Within 30 days of pleading guilty, the Defendant agrees to complete and sign a financial disclosure statement or affidavit disclosing all assets in which the Defendant has any interest or over which the Defendant exercises control, directly or indirectly, including those held by a spouse, nominee, or other third party, and disclosing any transfer of assets that has taken place within three years preceding the entry of this plea agreement. The Defendant will submit to an examination, which may be taken under oath and may include a polygraph examination. The Defendant

will not encumber, transfer, or dispose of any monies, property, or assets under the Defendant's custody or control without written approval from the United States Attorney's Office. If the Defendant is ever incarcerated in connection with this case, the Defendant will participate in the Bureau of Prisons Inmate Financial Responsibility Program, regardless of whether the Court specifically directs participation or imposes a schedule of payments. If the Defendant fails to comply with any of the provisions of this paragraph, the United States, in its discretion, may refrain from moving the Court pursuant to U.S.S.G. § 3E1.1(b) to reduce the offense level by one additional level, and may argue that the Defendant should not receive a two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a).

10. The Defendant understands and agrees that, pursuant to 18 U.S.C. § 3613, whatever monetary penalties are imposed by the Court will be due and payable immediately and subject to immediate enforcement by the United States. If the Court imposes a schedule of payments, the Defendant agrees that it is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment. The Defendant waives any requirement for demand of payment on any fine, restitution, or assessment imposed by the Court and agrees that any unpaid obligations will be submitted to the United States Treasury for offset. The Defendant authorizes the United States to obtain the Defendant's credit reports at any time. The Defendant authorizes the U.S. District Court to release funds posted as security for the

Defendant's appearance bond in this case, if any, to be applied to satisfy the Defendant's financial obligations contained in the judgment of the Court.

11. The United States will recommend releasing the Defendant on the current conditions for future court appearances if the Defendant does not violate the terms of the order setting conditions of release.

12. This document and the supplement contain the complete and only Plea Agreement between the United States Attorney for the Eastern District of Kentucky and the Defendant. The United States has not made any other promises to the Defendant.

13. This Agreement does not bind the United States Attorney's Offices in other districts, or any other federal, state, or local prosecuting authorities.

14. The Defendant and the Defendant's attorney acknowledge that the Defendant understands this Agreement, that the Defendant's attorney has fully explained this Agreement to the Defendant, and that the Defendant's entry into this Agreement is voluntary.

CARLTON S. SHIER IV
UNITED STATES ATTORNEY

Date: 1/30/23     By: *(signature)*
EMILY GREENFIELD
Assistant United States Attorney

Date: 1/30/23     *(signature)*
JASON S. GROVER
Special Assistant United States Attorney

Date: 1/30/23

_____
MICHAEL FOX
Attorney for Defendant

Date: 1/30/23

_____
WALTER PERKINS
Defendant